Good morning. Tom Cotter on behalf of Joe and Monica Olson and Javier Vargas. I'd like to reserve five minutes for rebuttal, if I may. I'll try to notify you, but it's your responsibility. Thank you, Your Honor. This case raises the issue of whether the government met its burden of proving that the plaintiff's allegations in the Federal Tort Claim Act fell within the discretionary function exception. And I think the simple answer to that is we are here to decide a case under very similar circumstances to ones that this court has already decided on a number of occasions in recent years. And I intend to argue that this Court's holding in the Marlis-Fair case, in the Routh case, and in the Camasi case are virtually indistinguishable on the salient points from this case. And that the Court will, although they did not involve MSHA, two of the three involved OSHA, and as my argument develops, I hope the Court will see why the facts are similar. I'm going to take a minute with the facts, although I know the Court's familiar, just to give the Court a sense of what happened here. This is an underground copper mine. In the copper mine, there's a main drag that will take you down into the stopes where the mining actually takes place. In the mine itself, the miners can't see because it's pitch dark, and their only lighting source are their helmets. They basically can't breathe very well because it's hot, and the forced air fans to try and move the air through create such noise that it's hard to hear. Now, historically what the mine had done, it had operated using explosives to take the floor. And what I'm going to try to explain, Your Honor, is that basically there's a 20-foot developmental level. You go through and you shoot 20 foot of passageways. Then, when you want to mine additional copper, you send the miners into stopes, you direct what they drill into the floor, you blow it up, and you muck out the ore. The significance of that is if you have previously roof-bolted, you don't have the danger of rocks overhead coming down and crushing the miners. Unfortunately, ASARCO developed shortly before 1999 the decision that they're going to start taking the back. For reasons I don't understand, the back is the ceiling. But what they decided they were going to do is they were going to shoot two cuts through the mine, each cut being about 12 feet deep, so that the first cut would raise the roof, the back, from 20 feet to 32 feet, and the second cut would raise it again to 44 feet. I was looking at the ceiling and I was trying to determine if maybe this is as high as it would be after one cut. The significance of that is that the federal mine inspector is required to respond to complaints of serious, imminent dangers and to inspect the mine four times a year, the entire mine. That's the statute, the entire mine. And if he finds dangers, he can direct the mine operator to take down the loose ground or support it where necessary. And it's our allegations in this case that the mine inspectors were negligent in responding to complaints that I'll talk about and in their inspections. So what happens is Mr. Villanueva, a miner of 37 years with a lot of experience, he's sent to do this work. And he realizes, because ASARCO doesn't want to spend the time and money roof bolting, he realizes you've got to be kidding. I'm going to drill these holes. Me and my two partners are going to drill these holes. We're going to blow this back. They're going to muck it out, and they're going to send us in there again, and those rocks are going to fall on our heads, and we're going to die. But he knew that he couldn't complain directly to MSHA because despite the statutes, the mines retaliate. And so he wrote a letter. Well, this is a reasonable inference from the record because the identity of the anonymous author was never determined. But after the investigation, Mr. Villanueva was the only dead person, and so it's at least reasonable to suggest, given the later facts, he wrote it. So he writes a letter saying to MSHA, says, what's going on at this mine is they're not using ground support, which is the roof bolting, and they are hiding it when you come through. They're berming off the areas so your inspectors don't see it. And a man named Kirk, who worked for MSHA as a field supervisor, is there, and he gets that letter, and we don't know what he did. Because unfortunately, we were prohibited from doing any discovery in this case. But there are two sets of facts the courts could find because we have an inspector general report that says he basically did nothing with it, and he didn't keep any records of it. There's no record whatsoever to suggest he did anything with it. So the question really is whether he evaluated the reports. Well, the report you referred to says he didn't effectively evaluate it. That's true. And there's somewhat of a difference. We're not bound, I think, by that determination that he didn't effectively evaluate it. It seems to me your argument is that he didn't evaluate it at all because they were anonymous. Well, if you drop back five, Your Honor, my argument first is I should have been allowed to do discovery and take this man's deposition and challenge whatever factual assertions the government made. And I was prevented from doing that. My second argument is, on the one hand, the inspector general determines that he doesn't effectively evaluate it, which means at all, if you read the report. On the other hand, the CIRCLE fights all the citations, which are issued as soon as our guys are crushed. They fight the citations. They take this guy's deposition. He says, oh, yeah, I got those reports. I got those evaluations. And I ordered my inspector to look into this. Now, the problem is there's no evidence that the inspector looked into it. So on the one hand, you have the inspector general saying he didn't do anything. And on the other hand, you have his deposition testimony in a case where the mine had no incentive to develop testimony in the same way that we did, that the inspector didn't do anything. So you have that factual dispute in a situation where the government has the burden of proof. But in any event, keeping with the facts, what happens is he gets the letter, we don't know that he did anything. He then gets three phone calls from Mr. Villanueva's daughter, and they're all ignored as well. And then perhaps because she thought the mine inspector would listen to a man and not listen to a woman, she has her boyfriend make two phone calls. And he doesn't do anything either. And so finally, during the first or one of four inspections at the mine, Mr. Villanueva goes to the mine inspector, which is pretty gutsy because he's going to end up losing his job if the circle finds out about it. And he tells the inspector, they're not roof bolting. And they're berming this stuff off. And what does the inspector do? He blows him in. He goes to the mine operator and says, well, I know who the source of the problem is now, you know. And so nothing gets done. And in January 2000, my two guys and Mr. Villanueva are sent in after the first cut, the first explosion. They're in there. Nine tons of rock come down. Mr. Villanueva is killed. Mr. Olsen-Vargas has a significant portion of his back crushed. And Mr. Villanueva is or I mean Mr. Vargas is unfortunately the guy on the ground. And so the rock hits the boom and bounces off and gets his leg, which is substantially crushed. And so the question then is, under these circumstances where we have allegations that Mr. Kirk didn't act reasonably and Mr. Varland didn't act reasonably, did the government come in and prove that that conduct was all subject to the discretionary function, discretionary function exception? And they have to prove first choice, some type of discretion or choice, and secondly, that it's susceptible to policy analysis. And so let's talk about the choice on those two things. First off, we have their own policy manual that says they have to, they have to evaluate and if appropriate, if appropriate, it does say if appropriate, inspection must follow. All right? We don't know that he did anything because as the inspector general said, if he had any notes, he threw them out. All right? Then later on, what he says in his deposition testimony with the mine is, oh, I told Varland to go look at him during his regular inspection. Well, what do we know about the regular inspection? Section 30 U.S.C. 813a says you have to inspect the entire mine. Did Mr. Varland inspect the entire mine? We know that he didn't. If you look in the inspector general's report, and it's in the excerpt of record at page 79, you will learn that Mr. Varland told the inspector general, well, guess what? You know, when I got into the mine, some areas were bermed off, so I didn't go in them. And then it turns out the next guy who does the inspection, again, before our action, says, you know, some areas were bermed off, too. When I got there, I decided they probably meant I was too dangerous for me to go in them. And the inspector general points out, well, you know, this is in face of the anonymous complaints that says, you know, they're berming off the areas that they don't want you to see. And then two days later, they have people in there. But nevertheless, the inspector doesn't go in there. And so there is a mandatory duty to inspect the mine in its entirety, which at least based on the inspector general's report, it is absolutely clear they didn't meet. Counsel, in order for you to have a claim, there would have to be a similar obligation under the laws of the State of Arizona in respect to inspectors and so forth. You bet. Now, there's a kind of immunity that is under the Arizona statute, and I'd like you to address that. Okay. There is an immunity that basically says you have to prove that government actors are grossly negligent. All right. Now, the standard for gross negligence in Arizona is, and you need to be careful. Some States say if you're grossly negligent, you can get whacked for punitive damages. That's not Arizona. We have a whole different standard for punitive damages. Gross negligence is just that you proceed in the face of a substantial risk of serious harm. Substantial risk, serious harm. What's the long and the short of it here? Basically, there is a short answer to this, which is I sued the State mine inspector in this case, and we settled with a confidentiality agreement. It wasn't everything that I would have gotten because they named the Federal mine inspector as a non-party at fault. But there wasn't any prohibition there. I am also the lawyer who in Diaz v. Magma Copper made the law that says you can sue the State mine inspector, and I've done it on several occasions, and it's true. You have to have, you have to be able to show that they ran afoul of a substantial risk of serious harm. Well, Your Honor, with all due respect, if you apply that law to the Federal mine inspector in this case, where they're basically being told we are caving in an area of the mine, and then we are sending people in the next day with no ground support to drill holes in it and do it again, and they're berming it off when you come to I think not going to look is running afoul of a substantial risk of serious harm. And I would be willing to take that. I don't get a jury in this case, even. I would be willing to take that back to Judge Browning any day. So your view is that the gross negligence standard applies even to a case of failure to inspect. Well, Your Honor, I'm aware that there is some Federal law that says in a Federal Tort Claim Act case, the Federal Government can't take advantage of state immunities. And I can tell you, Your Honor, I'm not waiving my right to claim that that law should be applied here, but I will tell you, even without that law, we can make this case. And, by the way, there's the second one. The answer to Judge Rustani's question was, does it apply to a failure to act as opposed to It does apply to a failure to act. It's acts or omissions. I'm sorry. Okay. So You can be grossly negligent through omission. Now, I was wondering if the immunity applied to failure to act as well as to negligent inspections. Well, again, we're talking about the state immunity, and the state immunity really only exists you can only hold the state actor liable in the event you can show gross negligence. It's basically a qualified immunity for simple negligence. I think I missed the Court's question. I'm not sure how. It's okay. Okay. There's a second prong that we argued about in the briefs, and I really do not believe it's a serious issue in this case, which is whether under the Good Samaritan doctrine there could be a case in Arizona. We have cited the court law that says there is, in fact, cases under the Good Samaritan law for failure to inspect in Arizona. There are three prongs under the restatement for what you have to show for a Good Samaritan case. The third one is reliance. There are affidavits in the record that we submitted saying that our mine inspectors or our miners relied on the Federal mine inspector to do his inspections, and inexplicably when Judge Browning ruled that there wouldn't be a case under the Good Samaritan doctrine, he only addressed the two standards and didn't address reliance at all anywhere in his order. And I cannot tell the Court whether it was inadvertent or intentional. I just don't know. Well, under the Good Samaritan doctrine, do you have to show that things were made worse? No. That's one of the tests, that they were made worse. All you have to show, though, is that someone one of the tests is that someone relied, and if they in fact relied, as these affidavits say, they relied on the Federal mine inspector, that they would regulate the mines and make it a safe place to work and going to work, that is sufficient under the restatement and under Arizona law to make out a Good Samaritan case. So either under the statutory, the mine inspector statutes, or under the Good Samaritan, there would be a case under Arizona law. You're down to your five minutes.  The two minutes are basically in the Marlis-Behr case, in the Roth case, in the Tamazi case, the government has the power to regulate a contractor on site with OSHA regs. And basically, this Court says the decision not to, you know, not to apply an OSHA reg or to negligently apply an OSHA reg does not, is not immunized under the discretionary function exception because failure to do safety monitoring is not the type of decision that's susceptible to policy analysis. So this Court has held with OSHA regs, which are directly analogous to HMSA regs, that in the Ninth Circuit at least, this conduct would not be subject to discretionary function. Thank you. Thank you, counsel. Good morning, and may it please the Court. Dana Martin for FLE of the United States. Counsel raises a lot of issues. Maybe I should just start right where he ended, on the Marlis-Behr, the Roth, and the Tamazi case. While some of those cases involved agencies supervising work, they weren't OSHA cases. They weren't cases where OSHA was enforcing its statutory mandate to inspect for safety at private workplaces. These were all cases in which the government was the landowner or was the contractor and was acting pursuant to those contracts. So the finding that those cases were not susceptible to policy analysis really has no bearing on whether MSHA, in effectuating its statutory mandate to promote safety at mines by conducting inspections, was acting pursuant to the discretion that Congress gave it specifically for that regulatory function, is susceptible to policy analysis. And on that, I mean, this Court has already spoken in the Cunningham case, which was actually an OSHA inspection case, that a claim of negligent inspection by a regulatory agency acting in its regulatory capacity is covered by the discretionary function exception and is susceptible to policy analysis, which is, of course, perfectly consistent with what the Supreme Court had structured in Gobert and in the Behr case, that both the large macro policy decisions and the decisions by agency actors using their discretion to effectuate those larger policy decisions are all protected discretionary functions. Kagan. Well, there's certain mandatory aspects of this statute, are there not, in the regulations? There are mandatory aspects, and we think the record is clear that the limited mandatory aspects, and those to those extents, there's no dispute that the agency complied with its mandatory responsibilities. Oh, yes, there is. There's serious disputes. Well, we'll, we'll. The first dispute is, did he evaluate at all? He had a duty to evaluate. Right. When I say there's no dispute, we think there's no dispute when you fairly look at the evidence, not that they don't dispute it. I don't mean to be misleading there. Yes. But we think, I mean, if you look at the Office of Inspector General report on which they rely for their proposition that no evaluation took place, it's clear that what the Office of Inspector General found was that the evaluation that was made was made negligently. Well, no, it's not so clear. I mean, that's one interpretation of it. When you say we're not, as I think their position is, that he, that the anonymous complaints he dismissed because they were anonymous, that, and then the Inspector General says, well, he didn't effectively evaluate them. Effectively is a little ambiguous. In fact, if you don't consider them because they're anonymous, you don't evaluate them. Well, I think if you look at that passage in the, in the report, it says he didn't evaluate, he didn't order any action because he concluded that they weren't valid because they were unsigned and that he didn't think they were specific enough. There's also, the same report also concludes that he did take some actions with regard to the complaints. Not, he didn't order an immediate inspection, but he did instruct people to, to look into the evaluations in conjunction with regularly scheduled inspections. So to say that he completely ignored them is just belied by the evidence on which they were lying. Certainly there's room to say that, you know, that, that his, his, what he did was gross, was, was inadequate. Well, or to say that he didn't evaluate them, that he looked at them, he didn't treat them as reports because they weren't signed or they weren't, they were anonymous. I mean, it's, it depends on how you characterize it. Right. But I mean, I think you've got to read that report as a whole and it also makes perfectly clear that he shouldn't. Well, but if you read it for summary judgment in the light most favorable to the plaintiff, let me sort of divert for a second. What about the fact that they were not allowed to take his deposition? Well, I think that was within the district court's discretion and the only thing they were pointing to, to suggest that there was a reason for more discovery was this one report. And the district court looked at that report and looked at what it said and concluded it didn't, it didn't create any, it didn't create sort of a need for discovery because it made amply clear that while the evaluation may have been cursory, it did take place and that's all that the agency policy required. It's not so clear. I mean, suppose they said to him, well, look, didn't you really look at these and say they're anonymous so I don't really have to evaluate them? Let's assume in a burst of integrity, he said, yes, that's right. That certainly is possible. It's possible that the deposition testimony that they rely on themselves, he said, I told the inspector to go out and evaluate them. So, again, to go and investigate them. That's not a deposition they were allowed to be present at, is it? That they relied on. But that was a deposition in the administrative procedure? Yes, exactly. They used it for a reason. I think we learned from Justice Scalia the other day how important it is to be able to confront a witness. Certainly, that's true. Why shouldn't they have had the chance to question the inspector before their case is dismissed when the issue is what did he really do? Well, two things about that. One, in terms of the relevance of all of this, of the, you know, the supervisor is not officially evaluating the complaints. I mean, this all goes to their argument that there should have been an immediate inspection. Inspections should have occurred sooner at this plant. But, I mean, the complaints that were received were received between May and September of 1999, the year where this all occurred. The accident occurred in January of 2000, and there were at least two inspections of the mine that occurred during that period. So now let's look at that. And did they inspect the whole mine? Their allegation that they did not inspect the whole mine is based on this idea that certain parts were cordoned off. But they knew that someone had said these are cordoned off because we don't want them to be seen by the inspectors. Right. The first inspector knew that. And he, in fact, the first inspector on the same page of the record that Mr. Cotter cited to you sooner, page 79, they say that the first inspector did go into areas that were cordoned off and looked at them. The second inspector didn't do that. It's not clear under the statute says the mine in its entirety needs to be inspected four times a year. When we're talking about mines in their entirety, we're talking about miles and miles of underground passageways and tunnels. But certainly it includes anywhere where the miners were working, doesn't it? Anywhere where the miners were working, certainly. And they had evidence that or word that they were working behind some of these firmed areas. Right. But again, but again, I mean, in evaluating, sorry, in inspecting the mine in its entirety, again, the agency has huge amounts of discretion in figuring out how to do that. I mean, it's not feasible, physically possible in a couple of weeks, which is how long these inspections take to, you know, look at everything at the same level of detail or concern or, and that's a discretionary decision. And again, as you say, because there were all of these complaints, perhaps the best course would have been to be particularly vigilant in looking at areas that were cordoned off. But again, that would be an abusive discretion. That would not be a failure to satisfy mandatory duty. In the face of a duty to inspect the entire mine, and in face of word that they're working behind some of these firmed areas, it seems to me that there's a failure of the mandatory duty to inspect the whole mine. They didn't say to Sarko, look, tell us which of these, where work is going on behind which of these firms. They never did that. We don't, it's true that we don't know whether they did that or not. We don't. Well, how about some discovery to find out about that? Well, if there were to be discovery to find out, it would be, I would just like to emphasize it would be extremely limited. It would be, the question would be, did you inspect the entire mine? Did you, you know, it would be just limited to sort of whatever the mandatory duty was. Mandatory duty, I would suggest, would go to looking at everywhere miners were working. Yes, but the level of detail with which you could do that. I mean, you know, whether they actually went into a cordoned off area perhaps would not be required. Miners wouldn't have been working there while the inspection was going on. I mean, again, I mean, this kind of back again goes to the need for judgment and discretion in figuring out how to do that. I assume one of the things the inspectors do if they need to inspect areas in back of berms, which may be dangerous, is to inspect them while the workers aren't in there, because then the rocks won't fall on the inspector's head. I don't know. I mean, you know, I haven't been there myself. I can't really say. But what I do know is that the particular accident that occurred here, the area where this particular accident occurred, that area of the mine had only been opened up two weeks before. So when any of these inspections occurred, they would not have occurred in the particular area where this accident took place. And the conditions that made this area dangerous, the blasting that Mr. Cotter explained that had occurred the previous day or whenever when they blasted up the ceiling, that previous action had loosened the ground support that had been there previously. So it was a dangerous condition that was created, sort of, this is the situation with these mines. I mean, the conditions are constantly changing. That's why the mine operator, not MSHA, is the one that has responsibility for assuring safety in the mine, because they're the ones who are positioned to do that. MSHA coming in and doing their inspections over the course of, I mean, MSHA could have gone into that area of the mine on day one of an inspection, and dangerous conditions could have been presented on day 14 of the inspection, and MSHA could have controlled that. And if they had, and the allegation is, if they inspected behind the berms, they would have noticed that the methodology they were using now was a different methodology and it was dangerous. Not that a particular stope needed to be inspected, but areas behind berms which would reveal this methodology needed to be inspected. Right. Now, the methodology itself was not unlawful by definition. The regulation that sets forth the responsibilities for ground support allows for, you know, any variety of methods. It just sort of says the ground support needs to be adequate and sufficient. So even if there had been a finding in an earlier instance that the particular method wasn't working, wasn't adequate in any given context, it wouldn't mean that it wouldn't be found to be adequate in another one. I mean, it's very different from coal mining, for example, where there are very specific requirements for how ground has to be supported. In the metal mining situation, the regulations specifically, you know, allow for judgment and discretion and that just as in many other areas. Turning, maybe I should turn briefly to the state law duty question. Arizona courts analyze claims for negligent inspection against private parties under the Good Samaritan Doctrine. And this court has done the same thing in the Scottish insurance case, in the Roberson case, in the Jeffries case that we cite in our brief. You only look to the liability of state and local actors in the rare circumstance where there's not a private person analogy that you can use. And here, in this case, Arizona courts have used the Good Samaritan Doctrine to deal with claims of negligent inspection by private parties. And that's a close enough analogy that that's the analysis this Court should apply and that the district court properly applied. Now, the hallmark there is liabilities imposed under the Good Samaritan Doctrine only if the voluntary undertaking by the defendant affirmatively made things worse, either by physically increasing the risk of harm or because the voluntary actors completely supplanted a duty that was owed by someone else. We know that neither of those circumstances are present here, because the law is clear that just by conducting an inspection, even if negligently, you don't make things worse than they already would have been if you hadn't been involved at all. And Your opposing counsel says it's enough if the party person relies on. Right. That was the next point, was the reliance argument. And it's true that justifiable reliance, which requires a showing that you forewent, you gave up specific precautions in reliance on somebody else, in reliance on the Isn't it enough for minors to say, look, I don't trust that company. I'd never go to work if it were up to them, but I think it's safe because my friendly United States government is there protecting me. Therefore, it's safe for me to go to work. That's not enough, Your Honor, for a couple of reasons. First, such reliance would be completely unjustified and it's completely at odds with the statutory scheme. I mean, Congress specifically said that primary responsibility for mine safety rests with the employer, with the assistance of the minors, not with MSHA. MSHA never took on the role of guaranteeing the safety of minors. And for a minor to rely on MSHA to do that is completely at odds with the statutory scheme. And it's also completely unreasonable. MSHA is not an insurer here. The only thing that makes it unreasonable for somebody to say, you know, I wouldn't fly in an airline that's not regulated by the government. But if I know the FAA is concerned about safety regulations, I'll fly on that airline. Why is it unreasonable for a citizen to think that when the government regulates the safety, that that makes it safe to do it, whereas if it's not being regulated by the government, I wouldn't want to take the chance? Isn't that a reasonable thing for somebody to say? I don't think it is, Your Honor. I mean, just by creating a regulatory program, a regulatory enforcement program, the government doesn't assume good Samaritan liability. If that were the case, you know, all that you would need, the undertaking would be enough. And the cases make it clear that the undertaking is not enough. I mean, in the Myers case, the Sixth Circuit expressly addressed this issue and said, you know, you can't find reliance when there's, you know, when it's completely at odds with the statutory scheme. And that's got to be the rule. Are there cases where it's a particularly hazardous industry recognizes particularly hazardous? Yes. I mean, the Myers case is an MSHA case. It actually involves the exact scenario we've got here, and it involved the exact allegation that the plaintiff said, look, we relied on MSHA to keep us safe. And the Court said that's not enough. It can't be enough because, you know, that's just at odds with the whole statutory scheme, and it's unjustified and unreasonable reliance. I mean, if you looked, if you do, I mean, just take an example sort of outside of the, I mean, outside of the government regulatory context. If you had, you know, a drowning man who somebody agrees to call 911 to help the drowning man, it's one thing for the drowning man to rely on the person to call 911. It's another thing for that person to say, okay, I'm relying on that drowning man to come in and save me, so I'm not going to try to save myself. I mean, that would be completely unreasonable and unjustified, and you would not, that would not be sufficient to be reliance under, you know, they can't unilaterally confer, you know. Let me ask you this. When we're looking at reliance in the context of what of the good Samaritan law, because that's, we're looking at Arizona law. Exactly. Exactly. So you can sue under Arizona law. So we need to know what Arizona law does. And it sounds to me, since they have this immunity section, that Arizona permits suits based on inspection schemes. Yes. Except, apparently, according to counsel, you've got to show gross negligence. Right. Arizona does permit suits for inspection schemes, but the immunity statute pertains to suits against government actors. With respect to private actors, and some of the suits against government actors, you don't, they don't go through the good Samaritan analysis in imposing liability. They find the regulation enough, if you can transcend the gross negligence requirement. But as to private actors, they apply the good Samaritan doctrine. I mean, the Daggett case, which is one of the Arizona cases they cite, they analyze a negligent inspection claim under both. And as to the good Samaritan analysis, they held that they couldn't make a cause of action because they hadn't made things more dangerous than they were before. The reliance cases that we cite in our brief in Arizona aren't negligent inspection cases, but they make clear, other than Daggett, no, Daggett I don't think talked about reliance specifically. It was talking about the increase in harm. But they make it clear. The examples of reliance are things where one doctor relies on a specialist to tell him whether or not an EKG, you know, whether somebody was having a heart attack or not, and use that diagnosis to release somebody from the hospital. I mean, it's something where the involvement of the cardiologist made things worse, you know. So, you know, if you're looking at the cases and all the cases that have actually involved this particular issue of a regulatory scheme, the courts have made it clear that you can't, just the existence of the regulatory scheme enough is not, is not itself, does not itself satisfy the reliance requirement of the good Samaritan doctrine. If I understand what you're saying, you do not and cannot look to the Arizona statute regulating officials. You can only look to the good Samaritan statute. Why? Because the Federal Tort Claims Act, by its very terms, says you look to, you have liability, your liability is the same as a private person under like circumstances. But the cases say that when the conduct is something that only government people would do and private people would not do, you look to the municipality or the State. That's right. The point is that, I mean, in this Court's Anderson decision, the government in that case, I think, was arguing that you should apply this sort of State doctrine that was applicable to fighting forest fires, liability for a fire that got out of control, because the State doctrine was a little bit different than the doctrine applicable to private people. There was more, I think there was more immunity available. And this Court said, no, we don't look to the government, governmental liability in this context. We look to private person liability because there is a doctrine under California law that applies to this situation of fires getting out of control. And even though it might be that the liability of municipal or State actors would be even closer, because I thought the difference is that there's no private analogy to the inspection statutes, whereas there may be private analogy in a fire control situation. Well, there is, there are private, there are cases under Arizona law involving private parties who allegedly conducted negligent inspections that are analyzed under the Good Samaritan doctrine. They don't have the same kind of duty, a relationship that the government does. No, that's true. I mean, it's a different, but, I mean, one of them is a consulting engineer on a project, and. It seems odd to me that you assert that because there's a doctrine, Good Samaritan doctrine, that doesn't apply, therefore you cannot look to the municipal or State analogy. Well, the Good Samaritan doctrine applies. It simply doesn't provide relief here, because, as we say, the reliance element isn't satisfied. But, I mean, I think that is the appropriate analysis. Under the plain language of the Federal Tort Claims Act, which says if you can, you look to a private person analogy, and here we've got one very clearly. And indeed, all the other circuits, when looking at negligent inspection cases, apply the Good Samaritan doctrine, as this Court has in the cases we cite in our brief, Scottish Insurance and Roberson. And we ask that the Court do the same thing here. Accordingly, for the reasons set forth in our brief, we ask that the Court affirm the district court. Thank you very much. Thank you. You've gotten packed a lot into that 20 minutes. I did what I could. Thank you. Your Honor, I'm sensitive. I only have three minutes. On the reliance. There are four minutes. Okay. On the reliance issue, Arizona is purely a restatement State. Sections 323 and 324 of the Restatement of Torts is Arizona law. And they say it's a fact question whether or not somebody relied. I think Judge Reinhart's comments make sense to me about why would you not rely on MSHA when you're working for the mine. That's its purpose. And I bet the director of MSHA thinks, I bet he has a website saying that what they do is make the mines in America safe for workers, and it makes perfect sense. But in any event, it's a fact question, and it's a question we should have been allowed to develop a record on. But in any event, under the Goods of American Law, there would be a claim in Arizona, and the cases are cited in our brief that support the claim. It makes more sense to me that where you have State mine inspectors and statutes making State mine inspectors or giving them duties, and Federal mine inspectors and statutes giving them, that that's the analogy you would look to, and the Ninth Circuit has issued some cases suggesting that. We've cited them. And there would be a case under that. So under either analysis, our case would survive. But all those cases are U.S. landowner cases. Oh, well, I think that we just shifted grounds. She said, I beg your pardon, Ms. Martin said that the cases I relied on are U.S. landowner cases, and I think actually the one where they're building a highway in Alaska, they're not actually, it's not a landowner case. It's a contractor case. But the point being, if you read the contracts in each of those cases, and they're fed forth in the contract, the contractor, the contracting officer, has the same obligations that the MSHA inspector does, which is to make sure that the general contractor who's primarily responsible for the safety of the workers, as is the mine operator, and I concede that point, in a mine, but the contractor, the officer like the MSHA inspector, has the obligation to see that the safety standards which have been applied by law, here by MSHA, there by contract are the OSHA regs, are enforced. And this Court said, both in Marla's Fair and in Roth, I'm sorry, that those OSHA I'm sorry, in Camasi, that Camasi and Marla's Fair are the OSHA cases. The same point is made in the Roth case, which is somebody who doesn't have falling object protection on his backhoe. It's a Federal contractor with a contracting officer who is responsible under the contract for the safety standards on the job site, for inspecting the safety standards, just as the MSHA inspector. And this Court held that his decisions, they specifically say his decisions, what to do and what not to do, are not the kind of decisions susceptible to analysis which gives rise to a Federal discretionary function exception. And so this Court would have to distinguish its own recent opinions under very analogous distinctions or very analogous situations to uphold the district court action or opinion. The last thing I wanted to say is, and I'm sure Ms. Martin just spoke, but she told you that the first inspector went behind the berms. Well, the reference is to page 79, and it reads this way. During the course of the September 1999 regular inspection, the mine inspector did not enter areas barricaded off by a SARCO management. And there was one inspection. There were two. No, no. One in which they did go into the bermed areas, and all of the others they did not. No. Actually, I don't think that's correct, Your Honor. This goes on to say, another inspector who inspected the area during a fourth regular inspection in November 1999 testified that the barricades implied that the area was too dangerous for MSHA inspectors to enter, and hence he did not inspect or cite a SARCO. He – I think there was a one inspection during March where they gave them a citation for ground support, but I'm not aware of anything in the record that indicates whether or not that was behind a barricaded area. Okay. Thank you. Thanks very much. Thank you both very much for a very helpful argument. The case is arguably submitted. The Court will take a brief recess. I'm going to clean up my – I'm going to clean up my – I'm going to clean up my desk.
judges: B. Fletcher, Reinhardt, Restani